Argued and submitted June 23, 1997, reversed and remanded April 22, 1998

## STATE OF OREGON,
*Respondent,*

*v.*

## FRED SCOTT MEYERS,
*Appellant.*

## (96-02-40968; CA A94881)

958 P2d 187

Philip A. Lewis argued the cause and filed the brief for appellant.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Wollheim,* Judges.

LANDAU, J.

---

* Wollheim, J., *vice* Leeson, J., resigned.

## LANDAU, J.

Defendant appeals from the judgment entered after his conviction for prostitution. ORS 167.007. He assigns error to the trial court's denial of his motion to suppress statements he made after a stop for a traffic infraction. We review for errors of law, ORS 138.220, and reverse and remand.

On January 31, 1996, at 2:20 p.m., Officer Chinn was patrolling an area in Portland known for prostitution activity, and where he had made prostitution-related arrests in the past, when he saw defendant's pickup truck parked in an unusual manner: The truck was parked in the parking lot of a duplex, tightly parallel to a fence that had wooden slats so that the truck was barely visible from the street. Chinn decided to investigate. When he drove into the parking lot he saw defendant and a woman, later identified as Naomi Carpenter, in the cab of the truck. Almost immediately, defendant drove away. Chinn followed, and when he saw that defendant and Carpenter were not wearing safety belts, a violation of ORS 811.210(1)(a) and (c), he stopped defendant for that traffic infraction. ORS 810.410.[1] Chinn explained to defendant the reason for the stop and asked him to step out of the truck and stand at its rear so that Chinn could watch both defendant and Carpenter. Chinn asked defendant the name of his passenger. Defendant identified her only as "Naomi." Chinn asked defendant for Naomi's last name, and when defendant could not tell him, Chinn told defendant that he was concerned about prostitution in the area and asked defendant if he were engaged in prostitution activity. Defendant denied that he was, but stated that he had "thought about it." Chinn asked defendant if he and Carpenter had agreed on a fee, to which defendant replied in the negative.[2]

---

[1] ORS 810.410 provides, in part:

"(3) A police officer:

"* * * * *

"(b) May stop and detain a person for a traffic infraction for the purposes of investigation *reasonably related to the traffic infraction, identification and issuance of citation.*"

(Emphasis supplied.)

[2] The trial court found that defendant replied, "not yet." However, Officer Chinn testified twice that defendant merely said "no." The reply, "not yet," is not in the record.

Chinn testified both that he then "placed" defendant in the back seat of his patrol car for officer safety reasons and that he "asked [defendant] to step into the back" of his patrol car while Chinn talked to Carpenter. Chinn did not frisk or handcuff defendant, but he closed the back door of the patrol car, locking defendant inside. Chinn then interviewed Carpenter for two or three minutes. She denied that she and defendant were engaged in prostitution, but she could not tell Chinn defendant's name. Chinn then returned to defendant and advised him of his *Miranda* rights. Defendant asked Chinn if he were under arrest, to which Chinn responded "not necessarily." Chinn then asked defendant to tell him the truth. Defendant admitted that he and Carpenter had been engaged in prostitution, and Chinn arrested him.

Before trial, defendant moved to suppress all statements obtained as a result of Chinn's questioning of defendant about Carpenter and prostitution activities. According to defendant, those questions were unrelated to the reason for the traffic stop, and Chinn lacked reasonable suspicion to broaden the scope of the investigation. In the alternative, defendant argued that his rights under Article I, section 9, of the Oregon Constitution,[3] were violated when Chinn locked him in the back of the patrol car. Defendant also filed a demurrer challenging the constitutionality of ORS 167.007, which prohibits prostitution. The trial court denied both the motion and the demurrer, and defendant was convicted following a trial to the court.

On appeal, defendant assigns error to the trial court's denials of his motion to suppress and his demurrer. We reject his argument regarding the demurrer without discussion and address only his argument that the trial court erred when it denied his motion to suppress. Defendant relies on *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995), for the proposition that an officer may investigate only a traffic infraction after a stop pursuant to ORS 810.410,

---

[3] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

unless the officer can point to some basis other than the infraction to broaden the scope of the investigation. The state responds that *Dominguez-Martinez* is inapplicable in this case because the traffic stop had not ended. Alternatively, the state contends that Chinn properly expanded the scope of the stop for a traffic infraction, because defendant's inability to tell him Carpenter's last name gave Chinn reasonable suspicion to believe that defendant was engaged in prostitution or attempted prostitution.

■ We first address the state's argument that *Dominguez-Martinez* and its progeny apply only to cases that deal "with acts occurring *after* completion of the traffic stop." (Emphasis supplied.) We rejected that argument in *State v. Aguilar*, 139 Or App 175, 177-78, 912 P2d 379, *rev den* 323 Or 265 (1996). In that case, a police officer stopped the defendant for a traffic infraction and questioned the defendant during the stop about drugs, because the officer had seen the defendant get into a car that was parked in front of a known drug house. Applying the rule in *Dominguez-Martinez*, we concluded that the officer exceeded the scope of his authority under ORS 810.410(3) when he questioned the defendant about drugs, because the fact that the defendant "entered a car that was parked in front of a known drug house, without more, does not provide reasonable suspicion to believe that he had engaged in a drug transaction there." *Id.* at 182. Defendant is correct that under the holding in *Aguilar* an officer may not broaden the scope of a traffic infraction stop unless the officer has reasonable suspicion that the defendant has engaged in illegal activity.

■ The facts in this case are similar to those in *State v. Butkovich*, 87 Or App 587, 743 P2d 752, *rev den* 304 Or 548 (1987). In that case, an officer patrolling a business area where there had been some burglaries in the recent past saw a car parked in the drive-up lane of a closed fast-food restaurant at 2 a.m. When the officer approached the car, the passenger looked very surprised and made motions that led the officer to believe that she was putting something underneath the seat. The officer ordered the passenger and the defendant-driver to get out of the car and subsequently found cocaine. We held that the officer lacked reasonable suspicion to believe that the defendant and his passenger were

engaged in criminal activity. *Id.* at 590. The circumstances of this case were even less suspicious. The fact that defendant had a female passenger in his truck at 2 p.m. in an area where the neighbors previously had complained about prostitution did not give Chinn reasonable suspicion to expand the scope of the traffic infraction stop. *See also State v. Moya*, 97 Or App 375, 377-78, 775 P2d 927 (1989) (no reasonable suspicion to search where the defendant sat in a car across the street from "Heroin Hotel," had been seen there before by the officer and made furtive gestures when approached by police officers).

Nonetheless, the state contends, the statements are admissible under Section 1 of Senate Bill 936 (SB 936), which provides, in part:

> "A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

> "(1) The United States Constitution or the Oregon Constitution * * *."

Defendant argues that SB 936 does not apply because his trial concluded before the law became applicable. In support of his argument, defendant relies on Section 38 of the new statute, which provides, in part, that "[Section 1] of this Act appl[ies] to all *criminal actions* pending or commenced on or after December 5, 1996." (Emphasis supplied.) According to defendant, "this case was 'pending' [on December 5, 1996] only in the sense that it was before this court after having already been litigated at the trial court level."

The meaning of "criminal actions pending" poses a question of statutory construction, the answer to which depends on our ascertainment of the legislature's intentions, as evidenced by the text in context and, if necessary, the legislative history. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).

SB 936 does not define the term "criminal action pending." The term, however, commonly refers to the process by which a defendant is brought *to trial* on criminal charges. *Black's Law Dictionary*, for example, defines "criminal

action" as a "[p]roceeding by which person charged with a crime is brought to trial and either found guilty or not guilty and sentenced." *Black's Law Dictionary* 336 (4th ed 1979). The term "proceeding," in contrast, generally refers to "any act which is done by the authority or direction of the court." *Id.* at 1083. If the legislature in SB 936 used the term "criminal action" in this commonly understood fashion, then the answer is clear: SB 936 applies only to criminal trials that are pending as of December 5, 1996, and not to criminal appeals pending on that date. The question is whether the legislature, in fact, intended that construction of the relevant statutory language.

The preliminary provisions of the Criminal Code, containing general definitions, appear to follow the traditional distinction. ORS 131.005(6) defines a "criminal action" as "an action at law by means of which a person is accused of the commission of an infraction, violation, misdemeanor or felony."[4] The term is contrasted in the statute with "criminal proceeding," which is defined—if somewhat tautologically— as "any proceeding which constitutes a part of a criminal action or occurs in court in connection with a prospective, pending or completed criminal action." ORS 131.005(7). The preliminary provisions also define "trial court" as the court that has authority "to dispose of a criminal action based on the accusatory instrument." Thus, the definitional provisions suggest that a "criminal action" is defined more narrowly to mean a criminal trial, and a "criminal proceeding" more broadly to include proceedings that occur in connection with a criminal trial.

Numerous other provisions in the Criminal Code (some 200 in all) use the term "criminal action," and the vast majority of them refer to the conduct of the trial. ORS 131.005(2), for example, refers to a "bench warrant" as the

---

[4] An earlier version of the definition even more clearly referred to a criminal action as an action by which a person is "accused *and tried for* the commission of an offense." ORS 131.005(6) (1995). In 1997, the legislature amended that definition as part of a package of amendments concerning court fees and collections by, among other things, deleting the words "and tried for." Or Laws 1997, ch 801, § 101. The deletion was intended to permit courts to collect fees in criminal actions that are not concluded by a trial. Nothing in the text or the legislative history of the amendments suggests that the legislature intended to broaden the term to include proceedings other than those that occur before trial courts.

"process of a court in which a criminal action is pending" that authorizes a peace officer to bring the defendant before the court. The same provision refers to the purpose of the bench warrant as "to achieve the court appearance of a defendant in a criminal action." The clear import of the definition is that a "criminal action" refers to the trial proceeding. ORS 131.335, for another example, provides that "the defendant in a criminal action may have the place of trial changed" under appropriate circumstances. The reference unambiguously is to trial proceedings alone. Similarly, ORS 156.010 refers to "[a] criminal action in a justice court is commenced and proceeded in to final determination;" it is clearly referring to trial proceedings alone. Many other provisions use the term in the same manner. *See e.g.,* ORS 135.455 (relating to the use of alibi evidence in a criminal action); ORS 135.855 (discovery of work product and other information in defense of a criminal action); ORS 136.005 (challenging a jury panel in a criminal action); ORS 136.330 (certain rules of civil procedure "regulate the conduct of the trial of criminal actions"); ORS 136.420 (testimony of witnesses in a criminal action). Other statutes draw the distinction even more clearly. ORS 131.015(1)(a) provides that the 1973 amendments to the Criminal Procedure Code apply to "[a]ll criminal actions and proceedings commenced upon or after January 1, 1974."

There are, however, a few statutes in which the legislature did not so carefully maintain the distinction between a criminal action and a criminal proceeding. In ORS 138.500-(1)(c), for example, the circuit court is authorized to appoint, "in a criminal action, the Public Defender as counsel on appeal." Similarly, ORS 157.060 provides that "[i]n a criminal action, the appellate court has the same authority to allow an amendment of the pleadings on an appeal that it has on an appeal in a civil action." It is thus at least possible that the legislature did not intend to use the term "criminal action" in Section 38 of SB 936 in its traditional sense.

■ We find no suggestion in the language of SB 936, however, that the legislature intended the term "criminal action" to be used in anything other than its ordinary sense. All indications are to the contrary.

First, it is clear from ORS 131.015 that, when framing a savings clause in the criminal law context, the legislature knows how to make a new law applicable to both criminal actions and proceedings, that is, by simply saying just that. In SB 936, the legislature did not do so. Instead of referring to the act as applying to both criminal actions and proceedings, it referred to pending criminal actions alone.

Second, other provisions of SB 936 appear to bear out the proper use of the term "criminal action" in its more limited sense of referring to trial proceedings. Section 1, for example, refers to the authority of the trial court to exclude evidence "in a criminal action." Evidence is not excluded on appeal. Section 29 similarly provides that "in criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible," subject to enumerated exceptions. Again, evidence is admitted at trial, not on appeal. In contrast, Section 2 more broadly refers to "any criminal proceeding" in which transcripts, audiotapes or videotapes may have been prepared, which section would—consistent with the traditional understanding of the relevant terms—apply to proceedings that are part of a criminal action or are connected with a criminal action. ORS 131.005(7). It is thus apparent that, in drafting SB 936, the legislature understood the traditional meaning of the terms "criminal action" and "criminal proceeding" and used the terms accordingly. Under the circumstances, we find it highly unlikely that the legislature intended to depart from that understanding only in Section 38.

To the extent that there is any ambiguity, it is not resolved by resort to legislative history of SB 936. Our examination of the legislative record reveals no discussion of the issue during the enactment process. Application of appropriate rules of construction, however, lead to the same result that is strongly suggested by textual analysis alone. To read Section 38 as the state suggests would mean that the legislature intended to change the rules of evidence retroactively, that is, after the trial courts already have ruled on evidentiary issues under the earlier law. Thus, rulings of the trial courts that were entirely correct at the time could be "transformed" into errors after the fact, and defendants would have

no opportunity to respond. Such a moving of the proverbial goal posts after the contest is over raises serious questions of due process. *See Jones v. General Motors Corp.*, 139 Or App 244, 264, 911 P2d 1243 (1996), *aff'd on other grounds* 325 Or 404, 939 P2d 608 (1997) (applying revised summary judgment standard retroactively on appeal would violate due process). When faced with competing constructions of a statute, we generally are required to "choose the interpretation which will avoid any serious constitutional difficulty." *State v. Duggan*, 290 Or 369, 373, 622 P2d 316 (1981). We conclude, therefore, that the legislature intended SB 936 to apply to criminal trials pending on or after December 5, 1996, not to criminal appeals.

In this case, the judgment was entered on September 26, 1996. SB 936, therefore, does not apply.

Reversed and remanded.